# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 22, 2012 Session

## STATE OF TENNESSEE v. PATRICIA ADKISSON

### Appeal from the Circuit Court for Hickman County
### No. 08-5095CRA    Timothy L. Easter, Judge

### No. M2010-02501-CCA-R3-CD - Filed May 2, 2012

The defendant, Patricia Adkisson, appeals her Hickman County Circuit Court jury convictions of 14 counts of aggravated cruelty to animals, *see* T.C.A. § 39-14-212, 16 counts of cruelty to animals, *see id.* § 39-14-202(a)(2), one count of the unlawful sale or transportation of dogs or cats, *see id.* § 44-17-103(a), and one count of unlawful administration of rabies vaccination, *see id.* § 68-8-103(d), for which she received an effective sentence of five years' probation to be supervised in a community corrections program, *see id.* § 40-36-106(f), followed by five years of traditional probation, *see id.* § 40-35-303. On appeal, she contends that trial counsel committed ineffective assistance of counsel, that the State failed to provide exculpatory material, and that the trial court imposed an excessive sentence. Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined. JEFFREY S. BIVINS, J. (not participating).

John P. Cauley (on appeal), Franklin, Tennessee; and Kenneth K. Crites (at trial), Centerville, Tennessee, for the appellant, Patricia Adkisson.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Kim R. Helper, District Attorney General; Terry Wood and Jay Fahey, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Hickman County grand jury charged the defendant with 24 counts of aggravated cruelty to animals, nine counts of cruelty to animals, one count of the unlawful sale or transportation of dogs or cats, and one count of the unlawful administration of rabies

vaccines stemming from a raid of the defendant's 90-acre farm that resulted in the confiscation of over 650 dogs and 100 other animals.

Jessica Mills worked for the defendant from June 2007 until June 2008, caring for over 450 dogs contained in cages along a hillside of the defendant's farm. A trailer located near the defendant's house contained approximately 200 "mama dogs and puppies." Ms. Mills' job duties did not include caring for the animals in the puppy trailer. She would, however, sometimes check on the animals in the puppy trailer to make sure they were being cared for. At one such time in the early summer of 2008, Ms. Mills discovered the animals without food or water. She also discovered approximately nine dead puppies in the trailer. Ms. Mills testified at trial that the defendant often "dumped" dead dogs "in the woods" or "on the side of a hill" in the back area of the property. Ms. Mills also testified that the defendant sometimes took older dogs "to a rescue" for possible adoption. She witnessed the defendant administer vaccinations to the dogs.

Ms. Mills testified that in May 2008 a former employee, Lisa Osborne, worked temporarily at the farm while the defendant visited family in Virginia. Ms. Osborne had not worked at the farm for over a month, and, in her absence, the defendant told Ms. Mills that the defendant was caring for the animals contained in the puppy trailer. When Ms. Osborne and Ms. Mills entered the trailer, however, they discovered that the animals had no food or water, that the cages had not been cleaned for some time, and that the animals were generally filthy and neglected. Ms. Mills recalled that Ms. Osborne cleaned the trailer for three days to return it to hygienic conditions. Ms. Mills said that, despite the defendant's purchasing over 300 pounds of food each week, many of the animals went unfed. Ms. Mills testified that Ms. Osborne telephoned the Humane Society to report the conditions at the farm. On June 25, 2008, after the defendant's return from Virginia, law enforcement officials armed with a search warrant and volunteers "raided" the defendant's farm and, over the course of two days, seized over 750 animals including cats, dogs, birds, and large farm animals.

Lisa Osborne testified that she worked for the defendant for approximately one and a half years, caring predominantly for the animals in the puppy trailer. Ms. Osborne stopped working for the defendant sometime in April 2008 when the defendant "r[a]n out of money" to pay her. The defendant asked Ms. Osborne to return temporarily when the defendant needed to travel to Virginia for one or two weeks in May 2008. When Ms. Osborne entered the puppy trailer, she immediately noticed that the trailer was "not clean . . . [and] bowls were dirty." She also noticed several dead animals, which she put in a bag and threw in the garbage as the defendant had instructed her to do. With her prior knowledge of the cleaning requirements of the puppy trailer, Ms. Osborne opined that it had been more than two days since the animals had been fed or the cages had been cleaned. She recalled that the dead animals looked as if they had been there for some time.

Ms. Osborne testified at trial that she never witnessed the defendant intentionally treat any animal in a cruel manner. Likewise, she acknowledged that the defendant always purchased food and provided running water for the farm. She determined that the animals' food and water bowls, however, were not being filled on a regular basis. Throughout her employment by the defendant, Ms. Osborne never had a reason to telephone the Humane Society. When she returned temporarily in May 2008, she said that she "walked in and [saw that] there w[ere] deplorable conditions," prompting her decision to telephone the Humane Society.

Jeffery Eyre, director of the Northeast Investigations Response Team for the American Society for the Prevention of Cruelty to Animals ("ASPCA"), testified that he assisted with the confiscation of animals from the defendant's farm on June 25, 2008. He recalled that the temporary shelter was located approximately 15 minutes from the defendant's farm and that most animals were assessed and transported within 45 minutes to an hour of locating them on the property. Volunteers assessed the animals at an on-site mobile clinic. Animals suffering from imminent health conditions were immediately transported to veterinarian clinics in the area while other animals were placed in air-conditioned areas to await transport to the shelter. Each transport vehicle carried 74 animals to the shelter per trip.

Doctor Melinda Merck, Senior Director of Veterinary Forensic Sciences for the ASPCA, assisted in the confiscation of animals from the defendant's property on June 25 and 26. Upon entering the puppy trailer, Doctor Merck noted that the trailer "was nasty, it was dirty, foul-smelling, covered in cobwebs." She witnessed puppies with their legs trapped in wire cages and saw "evidence that the cages had not been cleaned in a long time." The trailer was hot, and the cages contained very little food or water. Doctor Merck noted cobwebs across a full food bin, indicating that the animals had not been fed for some time, despite the availability of food. When offered water, the dogs fought to get it. Doctor Merck noted "molded feces" in the cages and that the cages had not been cleaned in "at least five to seven days."

In other areas on the property, Doctor Merck witnessed "dirty [conditions and a] lack of food and water." Even inside the defendant's house, the authorities found kittens in cages without food, water, and litter boxes. On the hillside, the authorities found "rows and rows of rabbit hutches [containing] multiple animals" totaling approximately 400 dogs. Some of the larger dogs had igloo-style doghouses that were placed in the direct sunlight, making them uninhabitable. Many of the dogs on the hillside had dug into the ground in an effort to find cool earth and a respite from the heat. An inspection of every animal area on the farm revealed a general lack of food and clean water.

Volunteers and authorities assigned an identification number to each animal as it was rescued and catalogued at the scene. Doctor Merck recalled that the first priority was to identify critically ill animals and transport them immediately to veterinarian clinics for treatment. All other animals were transported to a temporary shelter established at a local warehouse. The animals then remained at the shelter for several days before being transported to various permanent shelters and humane societies across the nation.

Doctor Merck testified specifically regarding several animals identified in each count of the indictment. Veterinarians diagnosed specific dogs found in the puppy trailer as being at a substantial risk of death due to malnutrition and inanition – a condition caused by "prolonged periods of time without food." Many of the animals also suffered from severe dehydration and anemia. One female adult Yorkie required immediate surgery to remove "puppies [that] had been dead for a while and were decomposing in the womb" causing a toxic infection. Another three month old puppy died the day after being rescued because it had suffered severe dehydration in the puppy trailer. One other adult female found in a cage with her puppies had killed two of the puppies and was eating them so that she could continue to sustain herself and, in turn, the remaining puppies. Doctor Merck explained that it was the dam's instinct to kill the weaker puppies to nourish herself and the rest of the litter. Veterinarians treated a Chihuahua puppy suffering from low blood sugar caused by severe malnutrition, but the puppy eventually died a few days after its rescue.

Doctor Merck testified that many of the dogs found along the hillside suffered from heat stroke because their cages were placed in direct sunlight without any shelter from the sun. One pregnant adult female found in a hillside hutch was emaciated and dehydrated. Doctor Merck testified that the dam "had started to give birth and was eating her young as soon as she gave birth." Although many of the dogs suffered from inanition, many more, if not all of them, had severely matted fur and filthy cages. The defendant housed males and females of different breeds within the same cages along the hillside; not one dog confiscated from the defendant's property had been spayed or neutered. Several pregnant dogs required "C-section[s]" once under veterinarian care because they were simply too malnourished and weak to deliver their puppies on their own, creating a substantial risk of death to, not only the puppies, but also the dams.

Authorities found several large dogs caged in a wooded area on the property. One female German Shepherd found in this area had dug a hole underneath her doghouse to provide cool shelter for her puppies. Another large dog, an adult Great Dane, had only dirty water and spoiled food available in its pen.

In an "open grave" area near the hillside, authorities discovered the carcass of a Brindle Boxer that had suffered four gunshot wounds – two to "the gut," one to the

-4-

abdomen, and one to the area "right between the eyes and forehead." They also discovered the carcass of a Chow that had been shot in the side of the head near its neck and also in its "mid body." Doctor Merck opined that the shots would have been very painful and would not have produced instantaneous death.

Near the defendant's home, authorities found an emaciated and severely dehydrated pregnant Basset Hound that required a "C-section" to deliver her puppies. More animals found inside the home suffered inanition and unsanitary conditions. Authorities discovered empty dog food bags inside the bed of the defendant's pickup truck. They found dead puppies inside one of the bags. Doctor Merck testified that the ammonia levels caused by the unsanitary conditions inside the puppy trailer caused eye and skin inflammations. She also opined that the wire cages were inappropriate for daily use because the animals need a smooth surface to walk and rest on. Doctor Merck testified that maintaining sanitary conditions required cleaning the cages twice daily and that the defendant did not have enough personnel to accomplish this task. The confiscation and temporary care of the animals taken from the defendant's property required approximately 150 workers.

On cross-examination, Doctor Merck explained that the animals' conditions were not worsened by the confiscation process because the workers assembled tents and awnings to protect each animal from direct sunlight and none of the animals waited on a trailer or transport truck for an extended period of time before being moved to the shelter or veterinarian clinic. Furthermore, each animal received food and water when rescued. Doctor Merck also testified that, although blood tests confirmed each case of inanition, "it was quite visible and visual that [the animals] were suffering" from malnutrition and dehydration by the animals' loss of muscle mass, protruding tendons and bones, and the condition of the animals' teeth and gums. She noted that many of the animals responded favorably within hours of rescue once they were provided food, water, and appropriate bedding.

Doctor Tom Edmonds, a Centerville veterinarian, examined 12 of the 30 animals sent to his clinic with imminent health concerns. One puppy that arrived with low blood sugar and in a comatose state responded favorably to treatment initially only to die during the night. Doctor Edmonds also performed "C-sections" on several pregnant dogs that were too weak from malnutrition to deliver their puppies; several puppies died during delivery due to the poor health of the dams. Doctor Edmonds had to surgically remove decomposing puppies from one dam to prevent the dam's dying from toxic poisoning.

Barry Carroll, a special agent with the 21st Judicial District District Attorney General's Office, testified that he executed the search warrant of the defendant's property at 7:50 a.m. on June 25 and remained on the property until 9:00 p.m. on June 26 when all the animals had been seized. The defendant told Special Agent Carroll that she had bred dogs

for 30 years but that sales had slowed recently to only six to eight dogs per month. The defendant admitted to vaccinating dogs without the supervision of a veterinarian. She also admitted that she was not licensed to sell dogs. The defendant took full responsibility for the condition of the animals, exonerating Ms. Mills completely. The defendant told Special Agent Carroll that she had shot 10 dogs with her 22 caliber pistol on June 14, 2008, because the dogs were diseased, mean, or aggressive and, therefore, "unadoptable." The defendant voluntarily relinquished the pistol to Special Agent Carroll. Likewise, she did not contest the removal of 747 animals from her property. Special Agent Carroll testified that the defendant's "health wasn't the best. And she said she just couldn't do it anymore, that it kind of spiraled out of control." Special Agent Carroll said that after the defendant signed the relinquishment document, the defendant left the property for the duration of the seizure. He described the animals' conditions as "pretty bad shape."

With this proof, the State rested its case. The defendant's Tennessee Rule of Criminal Procedure 29 motion resulted in the trial court's dismissing two counts of the indictment. Following a full *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 159,161-62 (Tenn. 1999), the defendant elected not to testify. She did, however, present further proof on her behalf.

The defendant's son, Mark T. Adkisson, testified that he was present during the seizure of the animals from his mother's farm. He recalled that the defendant was "not allowed to roam free" during the search. He said that he urged the volunteer workers to move trailers containing animals into the shade for the animals' well-being. Mr. Adkisson testified that caring for the animals became more difficult for the defendant after her husband's death in 2007. He said that the defendant was "up in her age" and needed help lifting the heavy feed bags and delivering water to the remote areas of the farm. Mr. Adkisson testified, however, that he never witnessed the defendant's failing to give proper attention or care to the animals on her property. He denied ever seeing conditions like those depicted in the photographs taken at the time of the seizure.

William Steele, a neighbor, testified that he saw the defendant's truck "absolutely loaded down with food" at least twice weekly. He denied ever seeing any of the animals suffering from harm or neglect. Likewise, Jimmy Frazier testified that the defendant purchased 102 bales of hay from him in the winter of 2007 and that any animals he had seen at the farm were in "excellent shape." Charles Christopher Plunkett, another neighbor, testified that he never saw the defendant harm or neglect any of the animals in her care. He recalled that any time he visited the defendant's farm, the defendant and her husband were "constantly working" to care for the animals.

Anna Marie McCoy testified that she was a former kennel operations

compliance investigator from Montgomery County. She testified that the defendant contacted her in January 2001 to inspect her farm to ensure she maintained compliance with state kennel requirements. Ms. McCoy testified that she inspected the defendant's farm annually and that she also helped the defendant maintain the facilities on a regular basis. Ms. McCoy claimed that Ms. Osborne reported the defendant to the Humane Society out of spite for the defendant's firing Ms. Osborne. Ms. McCoy also claimed that 256 animals died from June 25 through June 27 while under the care of the ASPCA at the temporary shelter. Ms. McCoy admitted that the defendant ran a "puppy mill" but explained that puppy mills are not illegal and that the defendant only bred dogs "in large quantity."

On cross-examination, Ms. McCoy admitted telephoning the defendant's house on June 25 and telling someone "that nothing better leave that property before [she] got there." Ms. McCoy denied ignoring Special Agent Carroll's attempts at an interview. She claimed that she had last visited the defendant's farm on June 22 and that none of the conditions existed that were discovered on June 25. She also admitted to caring for 150 dogs herself for some time in 2008 and only needing one paid employee to assist her.

Special Agent Carroll testified in rebuttal for the State that Ms. McCoy telephoned the defendant's house on June 25, identified herself as an animal abuse investigator with the State of Tennessee, and demanded that the authorities leave the defendant's property because she was investigating the defendant for animal cruelty. When Special Agent Carroll told Ms. McCoy that they were on the property with a "legal warrant," Ms. McCoy disconnected the call. For two months following the seizure of the animals, Special Agent Carroll attempted to contact Ms. McCoy for an interview. Once when he knocked on Ms. McCoy's door, Special Agent Carroll heard someone inside Ms. McCoy's home "shushing the dogs" and refusing to answer the door.

Special Agent Carroll testified that only one puppy died at the temporary shelter, not hundreds as claimed by Ms. McCoy. He also said that the defendant told him she used two local veterinarians to care for her animals. When Special Agent Carroll checked the clinics for records concerning the animals, however, he did not find any records of the clinics' caring for the animals.

Leighann McCollum, Tennessee Director for the Humane Society of the United States ("HSUS"), testified that the animals remained at the temporary shelter for five days. She said that no animals died at the temporary shelter but that one puppy died at a veterinarian clinic. She explained that the animals went to various humane organizations after their initial stay at the shelter and that, per HSUS contracts, each agency was required to file a "disposition report" on every animal. Only one other animal died after adoption, and that animal died from complications concerning her spaying. Ms. McCollum testified that

no animal was sold for profit and that any money collected as "adoption fees" was utilized to cover the medical care associated with the animal. Likewise, Ms. McCollum testified that the raid itself cost approximately $250,000 for which donations were accepted in the form of money or supplies.

Based upon this evidence, the jury convicted the defendant of 14 counts of aggravated cruelty to animals, 16 counts of cruelty to animals, one count of the unlawful sale or transportation of dogs or cats, and one count of the unlawful administration of rabies vaccinations. The jury also acquitted the defendant of one count of cruelty to animals.

At sentencing, the trial court imposed sentences of two years for each aggravated cruelty to animals conviction, 11 months and 29 days for each cruelty to animals conviction, and 30 days for the class C misdemeanor convictions. The court ordered consecutive service of five of the felony offenses, with concurrent service on the remaining offenses, for a total effective sentence of 10 years. The trial court denied the defendant's request for judicial diversion and full traditional probation, ordering five years' service on community corrections followed by five years' service on probation.

On appeal, the defendant contends that trial counsel committed ineffective assistance of counsel, that the State failed to preserve and provide exculpatory evidence, and that the trial court erred by denying the defendant's request for full traditional probation. The State argues that the defendant waived her claims of ineffective assistance of counsel and failure to preserve or provide exculpatory evidence and that the record supports the trial court's denial of full probation in this case. We will review each claim in turn.

*Ineffective Assistance of Counsel*

The defendant argues on appeal that trial counsel's failure to review in advance of trial Doctor Merck's 78-page report constituted such deficient performance that this court should presume the deficiency to be prejudicial. *See United States v. Cronic*, 466 U.S. 648 (1984). The State contends that the defendant waived the claim of ineffective assistance of counsel by abandoning it at the motion for new trial hearing. The defendant concedes, and the record reflects, that she did, in fact, abandon her claim of ineffective assistance of counsel at the motion for new trial hearing. She argues, however, that she only abandoned her claim because the trial court denied her request for discovery via the Post-Conviction Procedure Act and Tennessee Supreme Court Rule 28 at the motion for new trial stage. She further asserts that "the content of the transcript in this case is such that this Court can review it and, on its own, determine[] that the errors committed by [trial counsel] are so unacceptable and obvious that [trial counsel] should be found ineffective and that the prejudice that results from this failure is apparent within this record."

-8-

To establish relief via a claim of ineffective assistance of counsel, a defendant must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v.. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697. As discussed in *Cronic*, a reviewing court will presume prejudice to an accused's right to counsel only when there has been the complete deprivation of counsel at a critical stage of the proceedings, a complete failure to subject the State's case to adversarial testing, or circumstances of such a magnitude that no attorney could provide effective assistance. *Cronic*, 466 U.S. at 659-60.

It is apparent from the record that the defendant voluntarily abandoned the claim of ineffective assistance of counsel at the motion for new trial hearing. Whether the relinquishment of that claim stemmed from the trial court's pre-hearing discovery ruling is of no consequence because the defendant did nothing to preserve or advance any argument before the trial court concerning counsel's performance or, for that matter, the trial court's purported denial of discovery. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Consequently, the trial court made no rulings at the motion for new trial hearing concerning the ineffective assistance of counsel claim. Despite the defendant's insistence that this court make independent factual findings concerning trial counsel's performance, this court is precluded from doing so. *See, e.g.*, *Perry Anthony Cribbs v. State*, No. W2006-01381-CCA-R3-PD, slip op. at 64 (Tenn. Crim. App., Jackson, July 1, 2009) ("[A]ppellate courts are not fact-finding courts."), *perm. app. denied* (Tenn. Dec. 21, 2009). The issue is waived.

*Failure to Preserve or Provide Exculpatory Evidence*

Next, the defendant claims that the State failed to preserve and/or provide exculpatory evidence – blood samples, testing reports, and transportation logs – in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). She contends that the reports contributed to Doctor Merck's opinion that many of the animals suffered from inanition at the time of their rescue. She also contends that the transportation logs may establish that many animals

suffered in the heat while waiting to be transported to the temporary shelter. The State contends that the defendant waived the *Brady* issue by failing to object at trial via *Brady* and that, in any event, the claims have no merit.

The record reflects that, prior to cross-examining Doctor Merck, the defendant requested a hearing outside the presence of the jury to lodge a general objection concerning the "lack of provision" of Doctor Merck's report. Notably, the defendant made this objection after Doctor Merck testified for over a day concerning the findings contained in her report. Following some discussion between each party and the witness, it became apparent that defendant's counsel failed to review the witness' report that had been provided 14 months prior to trial. The trial court ruled that Doctor Merck had "testified from her report which had the conclusion from the lab report[s] in it" and ruled that "no discovery violation" had occurred. The defendant did not object at trial on the basis of *Brady*. Accordingly, we agree with the State that the defendant has waived review of this issue. *See State v. Dooley*, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000) (appellant's changing theory on appeal from that espoused at the trial court "constitutes a waiver of the issue").

As to the defendant's general discovery violation objection, the record reflects that, following the jury-out hearing, the defendant cross-examined Doctor Merck in great detail concerning her conclusion that many of the animals suffered inanition and dehydration. Doctor Merck's responses during cross-examination indicated that the blood tests merely confirmed what was "quite visual and visible" suffering by the animals. In other words, the blood test results did not serve as the primary basis of Doctor Merck's diagnoses. Under these circumstances, we cannot discern any prejudice stemming from the failure to provide in discovery the actual lab reports or blood samples.

As to the State's failure to provide the transportation logs, the defendant moved for a mistrial when Mr. Eyre was unable to produce transportation logs concerning the animals' move to the temporary shelter and how long the animals waited to be moved. The trial court denied the motion for mistrial concerning the transportation logs based upon Mr. Eyre's testimony that the animals waited between 45 minutes to an hour to be transported and that the animals were kept in shaded, ventilated areas throughout the wait. The State correctly notes that the defendant did not raise the issue of the transportation logs in his motion for new trial. As such, this issue is waived. *See* Tenn. R. App. P. 3(e) ("no issue presented for review shall be predicated upon . . . action committed or occurring during the trial of the case . . . unless the [ground] was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.").

*Sentencing*

In her final allegation of error, the defendant contends that the trial court erred by denying her request for traditional probation. *See* T. C. A. § 40-35-303. She claims that evidence presented concerning her physical and mental health "fell on deaf ears" and that a community corrections sentence requiring her to live in Tennessee, rather than Virginia, would adversely affect her health. *See id.* §§ 40-36-101 to -106. The State argues that the defendant failed to cite authority in support of her argument concerning the denial of full probation and, as such, the issue is waived. Alternatively, the State contends that the record supports the trial court's denial of full probation in this case.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d)(2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

-11-

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

Because, in this instance, the sentence imposed is ten years or less, the trial court was required to consider probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Nevertheless, the defendant bears the burden of establishing her "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b); *State v. Bingham*, 910 S.W.2d 448, 455-56 (Tenn. Crim. App. 1995), *overruled in part on other grounds by Hooper*, 29 S.W.3d at 9-10. In consequence, the defendant must show that probation will "subserve the ends of justice and the best interest[s] of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956)), *overruled on other grounds by Hooper*, 29 S.W.3d at 9-10. Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). Notably, in this case, the trial court did actually impose a full probationary sentence. The defendant's only objection, however, concerns the terms of her supervision pursuant to community corrections, which requires her to maintain residency within Tennessee, versus traditional probation, which may be transferred to another state for supervision.

At the sentencing hearing in this case, witnesses testified that the defendant's mental and physical health declined considerably following her husband's suicide in late 2007. Following the seizure of the animals, the defendant moved to Virginia to live with her mother. The defendant had established physician's care while in Virginia awaiting trial. Notably, witnesses testified that the defendant's mother was presently engaged in the kennel and breeding business.

The record also revealed, however, that in 1998 the defendant was charged with 253 counts of animal cruelty. A jury convicted her of three counts. On direct appeal, this court ruled the search of the defendant's farm unconstitutional and reversed and remanded the case. The court also concluded, however, that the evidence was sufficient to support the defendant's convictions. *State v. Patricia Adkisson*, Nos. M2000-01079-CCA-R3-CD and M2000-02319-CCA-R3-CD (Tenn. Crim. App., Nashville, Oct. 12, 2001).[1] As a condition of her probationary sentence, the defendant was forbidden from owning animals. Within one year and while her direct appeal was still pending in this court, the defendant violated her probationary sentence by selling a puppy to an undercover agent.

---

[1] The outcome of this 1998 case after remand is unclear from the record before this court.

The trial court denied the defendant's request for traditional probation based upon its finding that the defendant continued to engage in the kennel business for a substantial number of years following her 1998 convictions. The court ruled that a community corrections sentence was necessary to provide more stringent supervision within the state for at least a portion of the defendant's sentence. We conclude that the record supports the trial court's denial of full traditional probation in this case.

*Conclusion*

We determine that the defendant abandoned her claim of ineffective assistance at the motion for new trial hearing and that her allegations via *Brady* are waived. We also determine that the record supports the trial court's sentencing decision. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE